

# THE ATTORNEY GENERAL

## OF TEXAS

### AUSTIN 11, TEXAS

**WILL WILSON**
**ATTORNEY GENERAL**

March 4, 1957

Hon. Wade Spilman, Chairman
House Judiciary Committee
House of Representatives
Austin, Texas

Opinion No. WW-31

Re: Constitutionality of House Bill No.
13, 55th Legislature, relating to
charges that may be assessed on
small loans.

Dear Mr. Spilman:

Upon initially perusing the above captioned Bill
several items were noted that appeared to be typographical
errors. Your attention was directed to them in a letter to
you of January 29, 1957, a copy of which is attached to this
opinion. Subsequently, the Honorable Tony Korioth on behalf
of the committee advised this department in writing that the
assumptions were correct, and that our opinion as to the con-
stitutionality should be based upon the language set out in
our letter to you. Accordingly this opinion will be based
upon the Bill as so modified.

The basic subject matter of the proposed Bill has
been the subject of several prior Attorney General's opin-
ions.[1] The Bill fixes a maximum rate or ceiling upon all
charges that may be received, except by such persons as are
exempt from the Act, on all loans which have an original loan
principal of $500.00 or less. The proposed Bill does not au-
thorize any charges whatsoever, but merely places a limitation
upon all charges that may be assessed by persons subject to
the Act.[2] In short, it is a limitation and not an authoriza-
tion Bill. Some of the prior rulings of this office have been
based upon Bills that authorized certain charges in addition

---

[1] Opinions MS-187, dated March 15, 1955; V-804, dated April
7, 1949; R-2283, dated January 31, 1951; O-5384, dated August
4, 1943; O-3206 and O-726.

[2] See Sections 3(a), 3(b), 3(c) and 3(d) of the proposed
Bill; the term "charges" is defined in Section 3(d)(1).

to the constitutional rate of interest.[3]  Several of these
bills have been held to be unconstitutional.  See Attorney
General's Opinion No. MS-187 where it was held that the
substantially identical feature set forth in House Bill 573
of the 54th Legislature was constitutional.

The Act is not without its unconstitutional vices.
Article III, Section 35 of the Texas Constitution requires
that all subjects included within the Act be expressed in the
title thereof.  "The purpose of the constitutional require-
ment is to reasonably apprise the Legislature of the contents
of the Act."[4]  The caption of the Bill in question enumerates
a number of specific provisions, which do not logically in-
clude other provisions of the Act,[5] while it does not fairly
apprise the Legislature of the presence of the provisions
enumerated in footnote 5.  These provisions are therefore of
doubtful constitutionality.

Section 36, Article III of the Texas Constitution
provides, "No law shall be revived or amended by reference to
its title when in such case the Act revived or the section or
sections amended shall be re-enacted and published at length."
Section 1(e) of the proposed enactment attempts to amend a
number of statutes therein recited.  The attempted amendment
comes within the proscription of Article 36 and is void.

------------

[3] See Opinion O-726, O-3206, R-2283, and O-5384, for a full
discussion of these enactments.

[4] State v. Rodriguez, 213 S.W.2d 877 (Tex.Civ.App. 1948).

[5] Section 11 (relating to the making, obtaining, and intro-
duction in evidence of certified copies of official documents);
Section 12(a) and (b) (relating to advertising and posting a
schedule of charges by the licensee licensed pursuant to the
Act);  Section 13(a) (relating to other businesses in the same
office); Subsection 13(b)  (relating to pawnbrokers); Subsec-
tion 13(c)  (requiring the licensee to confine his business to
the place stated in the license); Subsection 13(d) (forbidding
the licensee to take a lien upon real estate as security for
the loan); Subsection 14(a) (relating to the requirements for
making and payments of loans); Subsection 14(b) (relating to
confession of judgment and incomplete instruments); Subsection
14(c)  (relating to installment payments); Section 17 (relat-
ing to the requirements for a valid assignment of wages); and
Section 20 (relating to collection methods).

The loan business as a class may be regulated.[6] Section 1(d) of the proposed Bill, though, exempts certain businesses from the purview of the Bill.[7] If the proposed legislation, by such exemptions, discriminates against persons of the same class who are similarly situated, then the legislation is invalid.[8] Regulatory statutes in other states almost invariably exempt from their provisions not only State and Federal banks, but also trust companies and building and loan companies, and such Acts have been upheld.[9] The Bill, however, while exempting trust companies doing business under the Texas Banking Code of 1943, under Chapter 7 of the Insurance Code and under Article 1513, Vernon's Civil Statutes, leaves trust companies doing business under Article 1303b subject to the purview of the Act. Article 1303b companies are trust companies in the same sense as Chapter 7 and Article 1513 trust companies.[10] Therefore the Act unjustly discriminates against persons of the same class similarly situated, and the trust exemptions are void. Noting the absence of a severability clause, it is doubtful that it is the legislative intent to enact the bill without exempting trust companies, since trust companies belong to the same class of lending institutions as the exempted businesses. The Act therefore falls in its entirety.

---

6/ Juhan v. State, 216 S.W. 873 (Tex.Crim.App. 1918).

7/ Exempted institutions are State banks, rural credit unions, agricultural and livestock pools, mutual loan companies, co-op credit associations, farmers co-ops, trust companies incorporated under Article 1513, agricultural finance corporations, marketing and warehouse corporations, building and loan associations, and surety and trust companies organized under Chapter 7 of the Insurance Code. (A Bill is now pending in the Senate which would divest Chapter 7 of the Insurance Code of the surety and trust company features.)

8/ Ex parte George, 215 S.W.2d 170; Ex parte Smyth, 28 S.W. 2d 161-163.

9/ See annotation 69 A.L.R. 582, and annotation 125 A.L.R. holding that such statutes do not violate the due process and equal protection of the law clause of the Federal Constitution or the following provisions of the State Constitution: the due process clause, uniform operation of laws of general nature, prohibition against local and special laws, prohibition against a special law attempting to regulate interest, and prohibitions against the granting of special privileges and immunities.

10/ Carney v. Sam Houston Underwriters, 272 S.W.2d 942 (Tex. Civ.App. 1954, writ ref. n.r.e.)

Since this vice can be easily remedied by amendment, and since a fair answer to the questions propounded requires examination of further sections, other items raising substantial questions will be discussed.

There are a number of problems presented by reason of the fact that Section 21 makes every violation of the proposed Act a misdemeanor. Each provision of the Act must be carefully examined to see whether it meets the stringent requirements of the due process clauses of the Fourteenth Amendment of the United States Constitution and of Article 1, Section 19 of the Texas Constitution, and the provisions of Section 10, Article I of the Texas Constitution, wherein it is stated:

"In all criminal prosecutions the accused shall have speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof. . . ."

These two provisions set out certain criteria regarding the certainty in definition of an offense which any enactment must meet which purports to be a penal enactment. Such criteria would not necessarily be applicable were the violations not denounced as criminal. Several of the provisions are unconstitutional for failure to meet such requirements. The familiar rule is:

"A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must guess as to its meaning and differ as to its application lacks the first essential of due process of law."[11]

Article 6 of the Penal Code provides:

"Whenever it appears that a provision of the penal law is so indefinitely framed or of such doubtful construction that it cannot be understood, either from the language in which it is expressed, or from some other written law of the State, such penal law shall be regarded as wholly inoperative."

Article 3 provides:

"In order that the system of penal law in force in this State may be complete within itself,

---

11/  14 Am.Jur., Criminal Law, Section 22; Lone Star Gas Co. v. Kelly, 165 S.W.2d 446 (Tex.Comm.App. 1942, Opinion Adopted).

and that no system of foreign laws, written or
unwritten, may be appealed to, it is declared
that no person shall be punished for any act or
omission, unless the same is made a penal of-
fense, and a penalty is affixed thereto by the
written law of this State."

While these Penal Code provisions are not contained
verbatim in the Constitution of the State of Texas, the crimi-
nal courts have frequently invalidated statutes which did not
meet the requirements of Article 6 and Article 3; and in
Williams v. State, 176 S.W.2d 177 (Tex.Crim.App. 1943) the
Court, in discussing the meaning of Article 3, stated that such
was the meaning of due process as guaranteed under the State
and Federal Constitutions. Other decisions by the Court of
Criminal Appeals indicate that Article 3 and Article 6 have been
regarded by the Court as being declarative of the constitutional
requirements of due process.

In making applications of these general rules your
attention is directed first to Section 14(c) of the proposed Act
in which it is provided:

"And all installments shall be so arranged
that no installment is substantially greater in
amount than any preceding installment." (Empha-
sis added).

The case of Cogdell v. State, 193 S.W. 675 (Tex.Crim.
App. 1917) involved almost identical language to that in Sec-
tion 14(c) of the proposed Act. In that case the Court held
that the phraseology "substantially a larger percentage" was too
indefinite and too uncertain to proscribe an offense for the
reason that it left to the finders of fact the task of defining
the term "substantially larger percentage," which was an essen-
tial element of the offense, and thereby allowed the court or
the jury to define and set out the limits of the crime. The defi-
nition of a crime is, of course, a purely legislative function,
and if the crime is not sufficiently defined by statute the court
cannot supply the defects of statutory construction by extension
of the statute, for as previously pointed out, each crime must
be denounced in writing. When the purported standard of criminal-
ity is such that such standard will vary depending upon who is
finding the facts, then the statute sets forth no standard at all,

and the crime is not sufficiently defined.[12] To allow a court and a jury to make an application of a given set of facts to a given and well defined standard of guilt is one thing; it is quite another to allow a jury or court to set up the limits of that standard of guilt. The latter procedure allows variance of the law and is proscribed by the Constitution, and that is exactly what would be done by this section when a court or a jury would try a defendant for making a loan in which one installment is "substantially greater in amount than any preceding installment."

What has been said concerning Section 14(c) is also true of Section 14(d)(3) of the proposed Act in which it forbids any licensee to "induce any person to enter into any loan contract which provides payments to be made at such time and at such period as will make it reasonably probable that there will be numerous defaults in payments." Furthermore, "In order to constitute a crime the act must be one which the party is able to know in advance whether it is criminal or not."[13] "Reasonable probability" is a flexible concept that means one thing to one person and something else to another. A licensee could not ascertain in advance what constituted reasonable probability of defaults, particularly in the marginal loan field which this statute endeavors to regulate. (Emphasis added).

Section 10(a) requires each licensee to keep and use in his business "such books, accounts and records as will enable the Secretary to determine whether such licensee is complying with the provisions of this Act and with the orders and regulations lawfully made by the Secretary hereunder." There

---

12/ This rule is further supported by Ex parte Slaughter, 92 Tex.Crim.App. 212, 243 S.W. 478 (1922), involving a statute forbidding any person to operate a motor vehicle on the public highway "where the territory contiguous thereto is closely built up, at a greater rate of speed than eighteen miles per hour." The phrase, "closely built up" was held to be so vague and indefinite as to make it impossible to establish any standard of guilt. Every individual could easily have a different concept as to what constituted a territory "closely built up." Therefore the statute was void.

13/ Ex parte Slaughter, supra; Griffin v. State, 86 Tex.Crim. App. 498, 218 S.W. 494 (Tex.Crim.App. 1920); Tozer v. United States (C.C.) 52 Fed. 917. (C.C. 1892).

is no way that a licensee may in advance ascertain what records will enable the Secretary to determine whether the licensee is complying with the Act. The statute must contain its own standard of guilt and not be made dependent upon subjective factors or limitations of others.[14] The Secretary of State is, in truth and in fact, defining what nonfeasance shall be criminal. This is an unconstitutional attempt to delegate to the Secretary of State the legislative prerogative and duty to define a penal offense. Analogous cases are set forth in the footnote which amply illustrate this rule of law.[15]

---

14/ In <u>Anderson v. State</u>, 21 S.W.2d 499 (Tex.Crim.App. 1929), the Court was concerned with the statute prohibiting any person who is "masked or disguised in such a manner as to hide his or her identity or to <u>render same difficult to determine</u> from going into or near any private house." In considering whether the statute was too vague to define an offense the Court noted that the act prohibited is made to depend largely upon the peculiarities that may affect the vision of the person or persons offended, and offends against Article 6 of the Penal Code and is therefore inoperative. <u>Griffin v. State</u>, 218 S.W. 494 (Tex.Crim.App. 1920), involved the validity of a statute prohibiting any person to operate an automobile, motorcycle, or bicycle upon the public highways of the State at night time whose front lamp shall project forward <u>a light of such glare and brilliancy as to seriously interfere with the sight of or temporarily blind the vision of the driver of a vehicle approaching from an opposite direction</u>." The Court pointed out that the determining factor of the guilt or innocence of the accused in this instance was to be determined by the effect of the light upon the vision of each individual driver of a vehicle proceeding in the opposite direction, and not upon any definite legal standard. The law requires a certain degree of definiteness in denouncing an act as criminal. "Our statute declares that those penal laws that are of such doubtful construction that they cannot be understood, either from the language in which they are expressed or from some written law of the State, are wholly inoperative." Citing Penal Code, Article 6.

15/ <u>Stephens v. Wood</u>, 35 S.W.2d 794 (Tex.Civ.App. 1930). Suit to enjoin the members of the Game, Fish & Oyster Commission, and all others charged with the administration and enforcement of Article 941 of the Penal Code, on the grounds that the statute was invalid. The statute prohibited anyone to have in his possession any seine, net or trawl without a permit issued by the Game, Fish and Oyster Commissioners or by their authorized deputy in any or on any of the waters of certain designated bays, streams, bayous or canals named in the Act. The plaintiffs insisted that this was an attempt on the part of the Legislature to confer upon

Section 20 penalizes the use or threat of use for the purpose of compelling or inducing payment "any means which the licensee is not legally entitled to use for such purpose." In effect this section makes it an offense to use any unauthorized or unlawful means to compel or induce payment. Nowhere in the Act does it specify exactly what means are prohibited, but leaves the definition and scope of the prohibited method to the general law, including not only extraneous statutory law but also the common law. The lender is unable to look to the statute itself to find out what acts are prohibited, but must be thoroughly acquainted with a complex system of law about which even courts are frequently puzzled in order that he may ascertain whether an act is criminal. It is apparent that "men of common intelligence must guess as to the meaning and differ as to the application of such a statute."[16] It therefore lacks the first essential of due

---

15/ (continued)
the Commissioners authority to determine when and under what circumstances this possession should constitute a penal offense by granting or refusing to grant the permission mentioned. Held: The contention of the plaintiffs should be sustained. The Legislature has no power to confer upon a commission, bureau or agent of the State power to make a law. Citing Article III, Section 1 of the Texas Constitution, and other authorities. The portion of the Act cited was then held to be unconstitutional and void for want of due process.

16/ 14 Am.Jur., Criminal Law, Section 22. Dockery v. State, 247 S.W. 508 (Tex.Crim.App. 1923), requiring the erection of a fire escape to be erected in accordance with the minimum specifications promulgated by the State Fire Marshall. Held: "If the Act under discussion be upheld, it would seem clear that the law requiring fire escapes would be such as that an essential part of it, i.e., the kind and character and specifications necessary, might be changed, modified, added to or taken from by a power other than the Legislature at the will, wish, or whim of such foreign power." It is an attempt to delegate to the State Fire Marshall power to make or unmake the element necessary to make out an offense, and is obnoxious to the Constitution. The conviction was reversed and prosecution ordered dismissed. Ex parte Willmouth, 67 S.W.2d 289 (Tex.Crim.App. 1933) involved the validity of a penal ordinance prohibiting the operation of an automobile for hire unless the same shall have attached thereto a taximeter of standard size and design to be approved by the Chief of Police. Held: An offense denounced by statute or ordinance must be plainly written to be effective. In other words, a completed law, if penal in its effect, must define the act or omission denounced as criminal with some degree of certainty. If the ordinance would be upheld it is clear that the size and design of the taximeter might be

process. The holding of State v. Gaster, 45 La.Ann. 636, 12 So. 739 (S.Ct.La. 1893) is applicable. In that case a statute penalizing any judge, justice of the peace, sheriff, or any other civil officer for committing a misdemeanor in the execution of their offices was held to contravene the provisions of Article VIII of the Louisiana Constitution which states that "In all criminal prosecutions the accused shall enjoy the right to be informed of the nature and cause of the accusation." In that case the court also held the statute unconstitutional on the ground that it was an unlawful delegation of legislative authority to the judiciary. Article XIV of the Louisiana Constitution is similar to Article II, Section 1 of our Constitution.[17]

Section 20 also provides that "any such action which, under the laws and court decisions of the State heretofore or hereafter made (which) amounts to an invasion of any legally protected interest of the borrower will also be a violation of this Act and shall subject the person guilty of this violation to the penalties herein provided."[18] The term "legally protected

---

16/ (continued)

changed at the will, wish, or whim of the Chief of Police. The Constitution forbids the delegation of law-making power by the Legislature. The section in question attempts to delegate to the Chief of Police law-making power, which is obnoxious to the constitutional requirement and is therefore invalid.

17/ Article XIV of the Louisiana Constitution divides the powers between the Executive, Judicial, and Legislative branches, and provides: "No one of these departments shall exercise power properly belonging to one of the others." Article II, Section 1 of the Texas Constitution provides:

> "The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."

18/ Parenthetical matter and emphasis supplied.

interest" is nowhere defined in the Act, and does not have a well-established common law meaning. It is a rather nebulous concept. It is evident that this does not meet the tests previosly cited by which men of common intelligence would not have to guess as to the meaning of the term "legally protected interest," and differ as to its application. Furthermore, a criminal statute, to be valid, must contain within it the definition of all essential terms, or those terms must be defined elsewhere in the written law of the State.[19] The objectionable language also attempts to authorize an enlargement of the term "legally protected interest" by judicial decisions any time in the future, thereby allowing the courts from time to time to enlarge by definition the proscribed conduct. This is nothing more than judicial legislation and is prohibited.

Section 6(c) requires licensees to maintain at all times "total assets of at least $25,000.00, either actually on loan or readily available for immediate loan." Failure to maintain the required assets can cause two possible results, suspension or revocation of license and/or criminal penalties set out in Section 21. Should a licensee's assets be depleted or placed beyond his control so as not to be "readily available for immediate loan," even without the licensee's fault or agency, as in the case of a wrongful garnishment or a bank failure, the licensee is criminally liable. He may not escape the consequences by surrendering his license immediately, for Section 8(c) provides that "such surrender shall not affect his civil or criminal liability for acts committed prior thereto." The effect of this Bill is to make it a crime for a licensee to be so unfortunate as to have his assets tied up by some circumstance beyond his control. This is palpably "arbitrary and unreasonable" and contrary to the due process clause of the Fourteenth Amendment to the Federal Constitution.

Section 8 of the Act deals with revocation, suspension, and reinstatement of licenses. Subsection (b) provides for only three days notice of a hearing to suspend the license. The time is to run from the day the notice is deposited in the mail. It is conceivable under such a provision that the letter would be deposited late Friday and received on Tuesday, the day set for the hearing. Does this constitute procedural due process? If the

---

19/ The well recognized rule for construing a penal statute is, "that if the statute is so indefinitely drawn, or if it is of such doubtful construction that it cannot be understood, either from the language in which it is expressed or from some written law of the State it is invalid and void." Ex parte Meadows, 109 S.W.2d 261 (Tex.Crim.App. 1937).

Legislature means to require reasonable notice, such is not reasonable and not due process[20] for it fails to meet the legislative mandate. If the Legislature does not intend reasonable notice, the result differs, for no notice is required to suspend the license. The right to lend money at <u>interest</u> is a creature of statute, and is not an inherent right. <u>Juhan v. State</u>, <u>supra</u>, note 6. Therefore the privilege to loan money at the higher rate of charge provided by Section 3(b) is a privilege which the Legislature grants to anyone licensed under the Act. The Legislature has the power to compel all persons subject to the Act to charge the lower rate specified in Section 3(a) of the Act. Suspension of the licensee's license simply prohibits him from making the charges at the higher rate as specified under Section 3(b). It does not prohibit him from loaning money. The license is granted to him pursuant to a general grant of police power to regulate the small loan business. If, in the interest of the enforcement of the police power vested in the Secretary by the Legislature, the Secretary chooses to revoke the license by a long standing rule in the State, he may do so without notice.[21] The licensee is not entitled to notice except that which may be granted to him by the statute. If the Legislature did not intend to provide reasonable notice, it would be a matter of legislative grace whether he received any notice at all, and compliance with the notice provided by the statute would be procedural due process.

Section 9(b) and (c) of the Bill gives sweeping investigatory powers to the Secretary of State, the Attorney General, and to any District Attorney or County Attorney, or to their respective representatives for the specific purpose of detecting violations (all of which are made criminal by Section 21) or securing information required by the Act. This authority is not limited to licensees and persons engaging in the loan

---

20/ Unless notice is given a reasonable time in advance of the hearing, it is insufficient. 1 Fed.Adm.Law § 295 (Von Baur 1942). See also, <u>Bellingham Bay & BCR Co. v. City of New What, Co..n.</u>, 172 U.S. 314, 43 L.Ed. 460, 19 S.Ct. 205.

21/ <u>Baldacchi v. Goodlet</u>, 145 S.W. 325 (Tex.Civ.App. 1912, error den.) involving the suspension of a license granted by the City of Austin to sell milk in the city. The ordinance did not provide for notification prior to revocation of the permit. The court reasoned that when the city was justified in regulating the occupation in the interest of public health, morals, safety, or welfare, by requiring a license, the power to revoke the license whenever in the opinion of the municipal authorities the public interest requires it, is inherent, and may be exercised without notice to the holder of the license, or affording him opportunity to be heard.

business, but may be asserted to investigate anyone whom the investigating officer has reasonable cause to believe is violating, or even about to violate, any provision of this Act. This sweeping authority contravenes the constitutional provisions against unreasonable searches and seizures. In the leading case of Boyd v. United States [22] the Supreme Court of the United States, in construing the search and seizure provisions of the Federal Constitution, which are substantially identical to Section 9, Article I of the Texas Constitution, held a Federal statute requiring production of private books and papers of a defendant in a suit to forfeit goods, unconstitutional as authorizing an unreasonable search and seizure. The Court pointed out that the proceeding was quasi-criminal, and that the production of such documents would be compulsory self-incrimination and therefore unreasonable. There is no distinction between compelling the production of incriminating papers and records, as in the Boyd case, supra, and allowing inspection of incriminating documents as is here authorized. Both are unreasonable searches and seizures. The distinction should, however, be drawn between what is here proposed and a statute which requires the production of records and authorizes inspection thereof by an administrative agency, but which does not impose criminal penalties. Such statutes have, on occasion, been held constitutional.[23] Allowing administrative officials to exercise such sweeping investigatory powers against the persons named in Sections 9(b) (3)[24] is of questionable constitutionality even if no criminal penalties were involved. Our holding does not make it necessary to discuss that question in this opinion. Section 9(c) contains the same vice as Section 9(b). In addition thereto, it authorizes the investigating authority to compel attendance of witnesses and to examine them under oath, but does not provide for subpoena power or any process to implement the examination. The witness has no way to know of the investigator's authority, nor is he apprised of the extent thereof, while at the same time he is asked to determine at his peril whether he will testify and reveal the information demanded.

---

[22] 116 U.S. 616, 29 L.Ed. 746, 6 S.Ct. 524, 29 L.R.A. 19 (1886).

[23] Culver v. Smith, 74 S.W.2d 754 (Tex.Civ.App. 1934, writ ref.)

[24] "Any person who the Secretary, Attorney General, or District or County Attorney has reasonable cause to believe is violating or is about to violate any provision of this Act, whether or not such person shall claim to be within the authority or beyond the scope of this Act."

## SUMMARY

It is doubtful that Sections 11, 12(a) and (b), 13(a), (b), (c) and (d), 14(a), (b), and (c), and 17 and 20 are included in the caption; Amendments provided in Section 1(e) are void; Sections 6(c), 9(b) and (c), 10(a), 14(c) and 14(d)(3) are void; Section 8(b) is of doubtful constitutionality; Section 1(d) (Exemptions) is unconstitutional and cannot be severed, causing the entire Act to be unconstitutional; Section 3, fixing maximum rates of charges would be constitutional if severable.

Very truly yours,


WILL WILSON
Attorney General


By  Wallace P. Finfrock
    Assistant

WPF:wb

APPROVED:

OPINION COMMITTEE

H. Grady Chandler
        Chairman